NOT FOR PUBLICATION                                                        CLOSED

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DELACY DAVIS, | Civil Action No.: 05-3720 (JLL) |
| Plaintiff, | |
| v. | **OPINION** |
| CITY OF EAST ORANGE, | |
| Defendant. | |

**LINARES**, District Judge.

Plaintiff DeLacy Davis,[1] a former police officer employed by the City of East Orange,[2] filed this § 1983 action alleging that the City of East Orange retaliated against him in violation of his First Amendment right of expression after he spoke out on certain matters of public concern. Currently before the Court is a motion for summary judgment filed by Defendant, City of East Orange, on January 14, 2008.[3] No oral argument was heard. Fed. R. Civ. P. 78. For the reasons

---

[1] It is unclear whether Plaintiff's first name is spelled "DeLacey" or "DeLacy." Plaintiff's counsel has spelled his client's name both ways. Compare Compl. Caption ("DeLacey Davis") with Plaintiff's Opp'n Br. Caption ("DeLacy Davis"). The medical records attached to Plaintiff's counsel's certification indicate that Plaintiff's name is spelled "DeLacy Davis." Accordingly, the Court will proceed under the assumption that such is the correct spelling of Plaintiff's name.

[2] Plaintiff retired in June 2006. See Tr. (Oct. 12, 2006) at 26:16-17.

[3] Plaintiff has also filed a cross-motion for summary judgment. See CM/ECF Docket Entry No. 22. By way of Order dated November 26, 2007, Magistrate Judge Claire C. Cecchi notified the parties that all "dispositive motions shall be filed by January 18, 2008." Defendant's motion for summary judgment was filed on January 14, 2008. Plaintiff's filing of a cross-motion for summary judgment on March 18, 2008 violated Magistrate Judge Cecchi's November 26,

that follow, Defendant's motion is granted.

## BACKGROUND[4]

Plaintiff, DeLacy Davis, an African-American male, was employed by Defendant, City of East Orange, as a police officer at all relevant times. A series of events arising out of Plaintiff's employment underlie his cause of action.

### Wright Litigation

The first incident that sets the stage for this lawsuit took place in 1997.[5] Captain Richard Wright, a white male, had filed a lawsuit that year against the City of East Orange, its mayor and its Chief of Police on the basis of reverse race discrimination. The Mayor of East Orange at the time was a black male by the name of Cardell Cooper. The Chief of Police, Harry Harston, was also a black male. Plaintiff claims that, despite several attempts to dissuade him, he testified at trial on behalf of Captain Wright. Shortly thereafter, Plaintiff was assaulted by a sergeant in the East Orange Police Department.[6]

---

2007 Order. Plaintiff's motion could be denied on such a basis alone. In any event, even if the Court were to consider Plaintiff's untimely cross-motion for summary judgment, because Defendant's motion for summary judgment is granted in its entirety, Plaintiff's cross-motion for summary judgment would be denied as moot.

[4] The following facts are undisputed unless noted otherwise. The Court reviews such facts in the light most favorable to Plaintiff, the non-moving party. See Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).

[5] Plaintiff's deposition was taken on October 11, 2006. Plaintiff has submitted a copy of this transcript in opposition to Defendant's motion for summary judgment. See Klausner Cert., Tr. (Oct. 11, 2006) at 46:4-6.

[6] Plaintiff does not specify when such incident occurred. See Klausner Cert., Tr. (Oct. 11, 2006) at 101:9-13.

## Support of Chief Grimes

The second incident underlying this lawsuit took place several years later in early 2001. Robert L. Bowser, serving as Mayor of East Orange at the time, suspended then-acting Chief of Police, Charles Grimes, as a result of an alleged altercation between Grimes and an attorney for the city at a meeting of the East Orange Police Commission, which resulted in assault charges being filed against Grimes. Thereafter, Mayor Bowser designated Michael Cleary, to serve as acting Chief of Police. As a result of Grimes' suspension, Plaintiff organized a rally in support of Grimes' reinstatement which was scheduled for February 2, 2001 in front of the East Orange City Hall. Plaintiff invited Reverend Al Sharpton to attend the February 2, 2001 rally which was – according to Plaintiff – scheduled to coincide with Black History month.

Plaintiff testified that one month prior to the scheduled rally, Mayor Bowser invited him to a private lunch at which time Mayor Bowser told Plaintiff that publicly supporting Chief Grimes and having Reverend Al Sharpton speak at the scheduled rally could hurt Plaintiff's career and that there would be consequences. According to Plaintiff, the rally went forward as planned and Reverend Al Sharpton did, in fact, attend. Plaintiff claims that his relationship with the City of East Orange went sour shortly thereafter. Plaintiff retired from the East Orange Police Department in June 2006.

## Plaintiff's Complaint

In light of the foregoing, Plaintiff commenced the instant cause of action on July 25, 2005, alleging that the City of East Orange retaliated against him for (a) testifying on behalf of Captain Wright in 1997, and (b) publicly supporting Chief Grimes in 2001. (Def. Opp'n Br. at 12). In this regard, Count One of Plaintiff's Complaint alleges a violation of Plaintiff's First

Amendment right of expression.[7]  In particular, Count One alleges the following specific acts of

retaliation, all of which occurred after the February 2001 rally:

> (1)     Two of Plaintiff's subordinate police officers were
>         reassigned to the schools squad on December 13, 2004,
>         causing Plaintiff to cancel the Christmas Basket Giveaway
>         for lack of manpower (Compl., ¶ 18);
>
> (2)     Plaintiff was denied a promotion to Lieutenant (Compl., ¶
>         19);
>
> (3)     Plaintiff, alone, was required to keep daily activity logs
>         (Compl., ¶ 20); and
>
> (4)     Plaintiff was ordered to turn over certain vehicles to the
>         Police Department (Compl., ¶ 21).

Count Two seeks payment of tuition for courses taken by Plaintiff at Fairleigh Dickinson

University, which had been approved by Grimes, in his capacity as Chief of Police, but never

paid by Defendant.

## LEGAL STANDARD

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil

Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits

show that there is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).

On a summary judgment motion, the moving party must show, first, that no genuine issue

of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to present evidence that a genuine, fact issue compels a trial.  Id.

---

[7]  This Court's jurisdiction is premised on 28 U.S.C. §§ 1331.  This Court's supplemental
jurisdiction over Count Two is premised on 28 U.S.C. § 1367.

at 324.   In so presenting, the non-moving party must offer specific facts that establish a genuine

issue of material fact, not just "some metaphysical doubt as to the material facts."   Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   Thus, the non-

moving party may not rest upon the mere allegations or denials in its pleadings.   See Celotex,

477 U.S. at 324.   Further, the non-moving party cannot rely on unsupported assertions, bare

allegations, or speculation to defeat summary judgment.   See Ridgewood Bd. of Educ. v. N.E. ex

rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999).   The Court must, however, consider all facts and

their reasonable inferences in the light most favorable to the non-moving party.   See

Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). With this framework in

mind, the Court turns now to Defendant's motion.

## DISCUSSION

Plaintiff asserts a claim against the City of East Orange, pursuant to 42 U.S.C. § 1983, for

violating his First Amendment rights of freedom of speech and association.   Section 1983 states

in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . subjects, or causes to be subjected,
> any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding
> for redress . . . .

42 U.S.C. § 1983.   To establish a violation of section 1983, Plaintiff must establish (1) that he

was deprived of rights, privileges, or immunities secured by the Constitution or laws of the

United States; and (2) that the alleged deprivation was committed under color of state law.[8]  See, e.g., 42 U.S.C. § 1983; Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); D'Aurizio v. Palisades Park, 963 F.Supp. 378, 383 (D.N.J. 1997).   Thus, section 1983 is not a source of substantive rights, but provides a vehicle for vindicating the violation of other federal rights.  See, e.g., Graham v. Connor, 490 U.S. 386, 393-94 (1989).

Defendant moves for summary judgment on the basis that: (a) the City of East Orange cannot be held liable under section 1983 under a theory of respondeat superior; and (b) Plaintiff has, in any event, failed to establish a prima facie claim of retaliation.

## I.      Municipal Liability

Defendant argues that Plaintiff's section 1983 claim should be dismissed to the extent that municipal liability is based upon a theory of respondeat superior. (Def. Br. at 8).  In particular, Defendant argues that Plaintiff's municipal liability claim is not cognizable because Plaintiff has not identified a municipal policy or custom which has caused his constitutional injuries. Id.

Plaintiff admittedly attempts to hold the City of East Orange responsible for the actions of Robert Bowser in his capacity as Mayor of the City of the East Orange, and Michael Cleary in his capacity as acting Chief of Police.   Municipal bodies, such as the City of East Orange, may not be held liable under section 1983 under a theory of respondeat superior.  See, e.g., Monell v.

---

[8]  The "under color of state law" element of section 1983 is similar to the state action requirement of the Fourteenth Amendment in that it excludes merely private conduct from the parameters of section 1983.  See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999).   This element is not in dispute.

Dep't of Social Services of the City of New York, 436 U.S. 658, 690-91 (1978); Brennan v.

Norton, 350 F.3d 399, 427 (3d Cir. 2003).[9]  Thus, the Court agrees that the City of East Orange

cannot be held liable for merely employing an individual who commits a constitutional violation.

     Although municipal liability must generally be premised on a municipal policy or custom

which caused Plaintiff's constitutional deprivation, see, e.g., Monell, 436 U.S. at 694, or on the

municipal entity's failure to adequately train its employees, see, e.g., Reitz v. County of Bucks,

125 F.3d 139, 145 (3d Cir. 1997), municipal liability may stem from a single act performed by an

individual with "final policymaking authority" for the municipal entity.  City of St. Louis v.

Praprotnik, 485 U.S. 112, 123-24 (1988); see also Brennan, 350 F.3d at 427-28 (stating that a

municipal entity may be liable under section 1983 for a decision by a final policymaker, i.e., a

decision which is not subject to review); McGovern v. City of Jersey City, No. 98-5186, 2007

WL 2893323, at *14 (D.N.J. Sept. 28, 2007) (same); Martinez v. Scerbo, No. 06-0819, 2006 WL

2583448, at *3 (D.N.J. Sept. 7, 2006) (same).

     Defendant does not dispute that both Mayor Bowser and Chief Cleary are policymakers in

their own right,[10] or that the City of East Orange can be held liable for their conduct. See Def.

---

    [9] The Third Circuit's opinion in Brennan v. Norton, 350 F.3d 399, 422 (3d Cir. 2003), which permeates this Court's legal discussion, was decided in the context of review of the district court's decision on a motion for judgment as a matter of law.  The standard for judgment as a matter of law under Rule 50 mirrors the standard for summary judgment under Rule 56.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

    [10] The question of whether Mayor Bowser and/or Chief of Police Cleary are, in fact, individuals with final policymaking authority for the City of East Orange involves an analysis of their official functions and duties under state law.  See Praprotnik, 485 U.S. at 124.  The parties have not addressed this issue, much less engaged in any type of meaningful analysis regarding same.  The Court, therefore, declines to engage in any such analysis and will, instead, assume for purposes of this motion that Mayor Bowser and Chief Cleary are individuals with final policymaking authority for the City of East Orange.

Reply Br. at 7.  Instead, in their reply brief, Defendant maintains that Plaintiff has not established a municipal custom or policy under Monell; however, this is not the theory of municipal liability under which Plaintiff is proceeding.  Rather, Plaintiff's theory of municipal liability is based upon the notion that "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." Praprotnik, 485 U.S. at 123; see also Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003).

Given Defendant's concession that Mayor Bowser and Chief of Police Cleary are policymakers for the City of East Orange and the East Orange Police Department, respectively,[11] and the plausibility of Plaintiff's theory of municipal liability, see, e.g., Praprotnik, 485 U.S. at 123, summary judgment on this issue is denied. See, e.g., McGovern, 2007 WL 2893323, at *14-15.  Notwithstanding the Court's denial of Defendant's motion on this issue, the Court remains mindful of the specific theory of municipal liability under which Plaintiff is proceeding in this matter.[12]

---

[11] See Def. Reply Br. at 7 ("Defendant cannot dispute that the Mayor and Chief of Police are policymakers.").

[12] See generally Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (holding that "that municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

**II.      First Amendment Retaliation Claim**

Defendant argues that Plaintiff's claim of retaliation should be dismissed inasmuch as Plaintiff  has failed to establish a prima facie claim of retaliation.  In particular, Defendant argues that Plaintiff did not engage in "protected activity" for First Amendment purposes.  (Def. Br. at 10).  In the alternative, Defendant argues that Plaintiff has failed to demonstrate that any such protected activity was, in fact, the motivating factor behind Defendant's alleged retaliation. (Id. at 11).

"A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." Baldassare v. State of New Jersey, 250 F.3d 188, 194 (3d Cir. 2001) (quoting Rankin v. McPherson, 483 U.S. 378, 383-84 (1987)).  The Third Circuit applies a three-part test to assess a public employee's claim of retaliation for having engaged in an activity protected by the First Amendment.  See San Filippo, 30 F.3d at 430-31; see also Hill, 411 F.3d at 125 ("We follow a well-established three-step test to evaluate a public employee's claim of retaliation for engaging in activity protected under the First Amendment.").

First, the plaintiff must show that he engaged in protected activity.  See, e.g., Hill, 411 F.3d at 125; San Filippo, 30 F.3d at 430-31.  In this regard, the plaintiff must demonstrate that the speech or expression involves a matter of public concern, Baldassare, 250 F. 3d at 195, and that his interest in that speech outweighs his employer's countervailing interest in avoiding workplace disruption. See, e.g., Pickering v. Bd. of Educ., 391 U.S. 563 (1968).

At step two, the plaintiff must show that his protected activity was a substantial factor in motivating the alleged retaliation. See, e.g., Hill, 411 F.3d at 125; San Filippo, 30 F.3d at 430-31.

This purported retaliation cannot be trivial or <u>de minimus</u> and must be "sufficient to deter a person of ordinary firmness from exercising his or her First Amendment rights." <u>See</u> <u>McKee v. Hart</u>, 436 F.3d 165, 170 (3d Cir. 2006). Finally, if the plaintiff makes these showings, a defendant may nonetheless defeat the plaintiff's claim if the defendant establishes that the same adverse employment action would have taken place even in the absence of the protected conduct. <u>See, e.g.</u>, <u>Hill</u>, 411 F.3d at 125; <u>San Filippo</u>, 30 F.3d at 430-31.

### A.      Protected Activity

<u>Matter of Public Concern</u>

In order to determine whether Plaintiff engaged in a protected activity, the Court must assess whether his actions in (a) testifying on behalf of Captain Wright, and (b) publicly supporting Grimes can be characterized as constituting speech on a matter of public concern. <u>See, e.g.</u>, <u>Holder v. City of Allentown</u>, 987 F.2d 188, 194-195 (3d Cir. 1993). "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.' " <u>Id.</u> at 195 (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 147 (1983)). Such inquiry focuses on the content, form and context of the activity in question. <u>See, e.g.</u>, <u>Baldassare</u>, 250 F.3d at 195. "The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.'" <u>Baldassare</u>, 250 F.3d at 195 (internal quotations omitted).

Plaintiff testified that, despite attempts to dissuade him from doing so, he chose to testify on behalf of Captain Wright – a white male – in a contentious reverse race discrimination case

against the City of East Orange in 1997.  See Compl.,¶ 7; Klausner Cert., Tr. (Oct. 11, 2006) at

42:4-22.  Although the parties do not address the issue of whether Plaintiff's testimony

constituted employee speech, or citizen speech,[13] racial discrimination is "a matter inherently of

public concern."  Connick v. Myers, 461 U.S. 138, 148 n. 8 (1983).  Moreover, "[t]he duty to

testify has long been recognized as a basic obligation that every citizen owes his Government."

Reilly v. City of Atl. City, Nos. 06-2591, 06-2734, 2008 WL 2579185, at *12 (quoting United

States v. Calandra, 414 U.S. 338, 345 (1974)).  "That an employee's official responsibilities

provided the initial impetus to appear in court is immaterial to his/her independent obligation as a

citizen to testify truthfully."  Reilly, 2008 WL 2579185, at *12.  It is, therefore, clear that

Plaintiff's testimony on behalf of Captain Wright – concerning the East Orange Police

Department's allegedly racially discriminatory policies – involved a matter of public concern for

purposes of the instant analysis. See, e.g., Connick, 461 U.S. at 146.

Turning now to Plaintiff's public support of Chief Grimes in 2001, the Court notes, once

again, that the parties do not address whether Plaintiff's public support in this regard constituted

citizenship speech or whether such arose out of his official responsibilities.[14]  This distinction is

critical because "when public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes, and the Constitution does

---

[13] See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006) (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

[14] "Whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law." Foraker v. Chaffinch, 501 F.3d 231, 240 (3d Cir. 2007).

not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421.  Plaintiff

testified that his support of Chief Grimes was based on his understanding that there had been a

"shoving match" between Grimes and one of the city attorneys which resulted in assault charges

being filed against Grimes, despite the fact that the city attorney "was not inclined to file a

complaint" against the Chief.  Tr. (Oct. 11, 2006) at 73:23-77:15.  According to Plaintiff, "that's

where it should have ended." Id. at 77:9.  Plaintiff went on to explain that "[g]enerally, as police

officers, we are taught no victim, no crime.  So if the victim, the alleged victim, says I don't have

an issue and that this was something we both participated in, then that's where it should have

ended." Id. at 10-14.  Thus, Plaintiff's public support of Chief Grimes apparently arose out of his

displeasure with the reasons underlying Chief Grimes' suspension, as well as the manner in

which his suspension was carried out.  The Court notes, however, that Plaintiff also testified that

"I supported the chief as the chief of police because I answered to him.  He was my boss." Id. at

74:19-20.

        Although it is not entirely clear to this Court that Plaintiff's role in organizing and

participating in the February 2, 2001 rally was done purely in his capacity as a citizen,[15] there is

insufficient evidence before this Court which shows that Plaintiff's role in this regard arose out

of any official duties or responsibilities.  The Court also notes that Defendant does not dispute

that Plaintiff's role in organizing the rally was done in his capacity as a citizen – rather than

pursuant to his official duties.  As a result, the Court concludes that Plaintiff's role in organizing

the rally in support of Chief Grimes is analogous to his participation in a public debate; thus, in

---

[15] See, e.g., id. at 74:19-20.

publicly supporting Chief Grimes at the February 2, 2001 rally, Plaintiff was speaking as a citizen for First Amendment purposes. See generally Garcetti, 547 U.S. at 433 ("Refusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contribution to the civic discourse.").

Having determined that Plaintiff's support of Chief Grimes was done in his capacity as a citizen, the Court must now assess whether such a demonstration of public support constitutes a matter of public concern. See, e.g., Holder, 987 F.2d at 195 ("An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.' ").  Such inquiry focuses on the content, form and context of the activity in question. See, e.g., Baldassare, 250 F.3d at 195.  "If the speech in question is purely personal, it does not fall under the protective umbrella of the First Amendment and public employers are therefore not limited by that guarantee in responding to disruption caused by the expression." Brennan, 350 F.3d at 42.  In this regard, the Third Circuit has explained that the speaker's motive, while often times relevant, is not dispositive in determining whether a particular statement or expression relates to a matter of public concern. See Brennan, 350 F.3d at 413.

Defendant argues that "Davis's actions were not even of general public interest let alone public concern for First Amendment purposes." (Def. Br. at 10). In particular, Defendant argues that "Davis has not set forth any proofs to show that the suspension was for an improper reason which would be of public concern calling into play his right to exercise free speech."  (Id.).  In

response, Plaintiff argues that "Davis' purpose for publicly supporting Grimes and obtaining

Reverend Sharpton at a rally was to let the community know how badly the Chief of Police [w]as

being treated, i.e., a public suspension." (Pl. Opp'n Br. at 13).

The content of Plaintiff's expression – rallying in support of his wrongly suspended Chief

of Police – appears on its face to address a matter of public concern.  Similarly, the form of

Plaintiff's speech – a public rally – also supports Plaintiff's position that his expression went

beyond the scope of a personal gripe.  Finally, the context in which this expression was made –

namely, several years after the City of East Orange Police Department had been accused of

engaging in racially discriminatory practices, and shortly after the criminal indictment and

suspension of its Chief of Police – also suggests that Plaintiff's expression sought to bring to

light problems facing the Department and City as a whole.  While Plaintiff may have been

motivated, at least in part, by some personal reasons (i.e., his loyalty to Chief Grimes), it is clear

that Plaintiff's expression in this regard was not merely an extension of a personal gripe he had

with the East Orange Police Department.  See, e.g., Watters v. City of Philadelphia, 55 F.3d 886,

895 (3d Cir. 1995) (concluding that "the public had a significant interest in learning about

problems which may have impaired the effective functioning of the EAP and which, in turn,

could have affected the delivery of police services, and that therefore the speech was on a matter

of public concern.").  Thus, given the obvious public nature of the rally itself, the interest in same

exhibited by members of the community and the press alike,[16] as well as the context in which the

---

[16] See Tr. (Oct. 11, 2006) at 77:24-78:2 (testifying that Reverend Al Sharpton came,
"[t]here was a protest.  There was a rally.  There was news.  It hit all of the papers."); see, e.g.,
Steve Strunksy, Trouble Finds East Orange, Again, N.Y. TIMES, Feb. 11, 2001 (2001 WLNR
3351389); see generally Benak ex rel. Alliance Premier Growth Fund v. Alliance Capital Mgmt.

rally took place,[17] the Court finds that Plaintiff's role in organizing and participating in the February 2, 2001 rally in support of the Chief of Police constituted a matter of public concern. See, e.g., Green v. Philadelphia Housing Auth., 105 F.3d 882, 886 (3d Cir. 1997) ("A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.' ") (citation omitted).

<u>Balancing of Interests</u>

Having determined that Plaintiff's conduct and expression in testifying on behalf of Wright, and publicly supporting Grimes constituted matters of public concern, the Court must now determine whether Plaintiff's free speech interest is outweighed by any injury his conduct could cause the City of East Orange as a public employer.  See, e.g., Baldassare, 250 F.3d at 197. In this regard, the Court must consider "the nature of the relationship between the employee and the employer as well as any disruption the employee's speech may cause, including the impact of the speech on the employer's ability to maintain discipline and relationships in the work place." Brennan, 350 F.3d at 413. "This inquiry is purely legal." Id.

The Court begins its analysis by noting that the parties' respective briefs were of little aid to the Court in assessing this particular issue.  In any event, with respect to Plaintiff's testimony during the Wright litigation, it is clear that the public's interest in hearing Plaintiff's truthful testimony regarding racial discrimination in the police department clearly outweighed any injury

_____

L.P., 435 F.3d 396, 401 n. 15 (3d Cir. 2006) (noting that district court did not err in taking judicial notice of certain newspaper articles because "[t]hey serve only to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true")

[17] See Tr. (Oct. 11, 2006) at 42:4-22; 54:18-25 (explaining history of turmoil within the City of East Orange Police Department).

to the City of East Orange that such speech could cause.  See, e.g., Reilly, 2008 WL 2579185, at

*13 (concluding that "the public's interest in hearing testimony about police corruption

outweighed [plaintiff's] interest in maintaining order").

With respect to the public's interest in hearing Plaintiff's public support of Chief Grimes,

although the City has a significant interest in effectively servicing the community, the public has

an equally significant interest in encouraging free and unhindered debate on issues concerning

problems within its police department. See, e.g., Watters, 55 F.3d at 895.  There is no indication

based on the record that Plaintiff's relationship with the City or its police department was

comparable to the "close working relationship" between a  District Attorney and his First

Assistant, or that Plaintiff's public support of Chief grimes significantly disrupted the City's

efforts in servicing the community or the proper functioning of its police department. See, e.g.,

id. at  897-98.  Other than arguing, generally, that Plaintiff's interest in his speech "must not be

outweighed by any injury the speech could cause to the interest of the city as an employer in

promoting the efficiency of its services," Defendant has given the Court no specific legal basis on

which to find that Plaintiff's interest in such protected speech is outweighed by the injury it could

cause the City of East Orange.

Because Plaintiff's conduct in testifying on behalf of Captain Wright in 1997 and

publicly supporting Chief Grimes in 2001 involved matters of public concern, and the City of

East Orange has failed to establish that its own interest outweighed that of its employee, the

Court will proceed in its analysis of Plaintiff's First Amendment claim. See, e.g., Watters, 55

F.3d at 899 (concluding that plaintiff's "speech was on a matter of public concern, and that the

City has not met its burden to show that the interest in the speech was outweighed by the

interests of the City").

## B.   Substantial Factor

To survive Defendant's motion for summary judgment, Plaintiff must also show that this protected activity was a substantial factor in motivating the alleged retaliatory acts.  Such acts include: (i) reassignment of subordinate officers, (ii) denial of promotion to lieutenant, (iii) requirement to keep daily activity log, and (iv) order to return vehicles.  Even if Plaintiff makes this showing, as indicated above, Defendant can defeat the First Amendment claim of retaliation if it can demonstrate that the same purportedly retaliatory action would have taken place in the absence of the protected conduct.  With this framework in mind, the Court will now evaluate Plaintiff's particular allegations of retaliation.

<u>Reassignment of Subordinate Officers</u>

Plaintiff claims that the City of East Orange retaliated against him by reassigning two of Plaintiff's subordinate police officers to the schools squad in mid-December 2004, causing Plaintiff to cancel the Christmas Basket Giveaway for lack of manpower. <u>See</u> Tr. (Oct. 11, 2006) at 58:9-14.  According to Plaintiff, this transfer resulted in "a huge embarrassment publically." <u>Id.</u> at 62:19-20.

During Plaintiff's deposition, Defendant's counsel asked Plaintiff whether Plaintiff was aware of a restructuring of the police department which occurred between 2004 and 2005 which resulted in significant movement of officers from department to department. Tr. (Oct. 11, 2006) at 60:2-5.  In response, Plaintiff testified that it was his understanding that the movement of certain subordinate police officers to the schools squad was not part of that restructuring.  In

support of his position, Plaintiff testified that "Chief Cleary and I had a conversation I want to say at his home during this same time period, and that was never a part of the conversation." Id. at 60:13-16.  In particular, Plaintiff explained that "I came in to see Chief Cleary, and he could not explain to me why he told me one thing and had done another." Id. at 61:5-7.  Plaintiff went on to state that "the reason that I believe it's retaliation is because those very same officers after I went out sick were put back into that unit to carry on community services activities." Id. at 61:17-20.

Plaintiff's theory regarding the retaliatory motive underlying this reassignment – as set forth in his deposition testimony – is speculative, at best, and thus insufficient to establish a genuine issue of material fact on this issue.  Even if Plaintiff is correct, he (a) provides no credible evidence that Mayor Bowser or Chief Cleary – in their capacity as policymakers for the City of East Orange – were the individuals responsible for the reassignment in question, or any other reassignment, for that matter,[18] and (b) provides no other type of causal link between the protected activities alleged (which took place in 1997 and 2001, respectively) and the subsequent reassignment of certain subordinate officers (which occurred in late 2004).  See, e.g., Brennan, 350 F.3d at 420 (rejecting plaintiff's First Amendment retaliation claim where "there is nothing other than [plaintiff's] claim of causation" to connect the protected activity to the purported retaliation).  Moreover, Plaintiff provides no evidence to support his assertion that the same subordinate officers who were transferred to the schools squad were transferred back into his department when he went out on sick leave.

---

[18] See Brennan, 350 F.3d at 423 ("noting that Brennan has produced no credible evidence that Palazzola was responsible for the transfer.").

Having said that, the Court is mindful, however, of two statements made by Plaintiff under oath which support his theory of retaliation, generally.  First, Plaintiff testified that he had a private lunch meeting with Mayor Bowser in January 2001 during which time Mayor Bowser asked Plaintiff not to bring Reverend Al Sharpton to the February 2001 rally, and warned Plaintiff that publicly supporting Chief Grimes and having Reverend Al Sharpton speak at the scheduled rally could hurt Plaintiff's career. See Tr. (Oct. 11, 2006) at 73:12-22.  In the same vein, Plaintiff testified that Edward Scott, a childhood friend of Mayor Bowser, had a conversation with Mayor Bowser regarding Plaintiff, wherein Mayor Bowser stated that Plaintiff was not a team player and that, as a result, he would not promote Plaintiff. (Id. at 86:10-17).[19]

Notwithstanding such statements, "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur, 475 U.S. at 483. The two individuals whom Plaintiff has

---

[19] Defendant urges the Court to disregard such statements on the basis that such statements "are nothing more than self-serving unsupported statements and hearsay upon hearsay." (Def. Br. at 8).  The Court agrees that Plaintiff's brief and statements of fact are replete with hearsay statements and that a certification or declaration from the declarant of such statements would have been preferable.  However, since there is no indication that the declarants of the hearsay statements Plaintiff proffers will be unavailable to testify at trial, the Court will consider such statements in adjudicating this motion.  See Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence . . ."); Williams v. Borough of West Chester, 891 F.2d 458, 466 n.12 (3d Cir. 1989) ("hearsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e., 'in a form that would be admissible at trial' "); King v. City of Philadelphia, No. 02-2845, 66 Fed Appx. 300, 2003 WL 1705967, at *3 (3d Cir. Apr. 1, 2003)  (" '[H]earsay evidence produced in an affidavit opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony . . .' " (internal quotation omitted)).

identified as responsible for establishing policy for the City of East Orange with respect to the subject matter in question are Mayor Bowser and Chief Cleary.  Plaintiff must, therefore, present evidence that a "deliberate choice" made by Mayor Bowser or Chief Cleary ultimately caused the reassignment of such officers.  Plaintiff has presented the Court with no such evidence.  Instead, Plaintiff merely makes a blanket claim that someone acting on behalf of the City of East Orange, took various measures – including reassignment of his officers – which resulted in Plaintiff's embarrassment at having to cancel the Christmas Basket Giveaway event.  Aside from Plaintiff's generalized testimony regarding (a) statements made by Chief Cleary, which have no direct bearing on whether or not he directed the reassignment in question, and (b) the fact that his officers were allegedly reassigned back to his department when he went on sick leave, Plaintiff has provided no credible evidence linking specific decisions made by Mayor Bowser or Chief Cleary to the reassignment in question.  Moreover, the 3-7 year time lapse between Plaintiff's protected activities and the reassignment of his officers is too remote to support an inference of retaliation. See, e.g., Brennan, 350 F.3d at 424.  As a result, based on the evidence contained in the record, no reasonable jury could conclude that Mayor Bowser or Chief Cleary were responsible for the reassignment of Plaintiff's subordinate officers in 2004.  The Court grants summary judgment in favor of Defendant on this issue.

<u>Denial of Promotion to Lieutenant</u>

Plaintiff claims that the City of East Orange retaliated against him for testifying at the Wright litigation in 1997 and/or for publicly supporting Chief Grimes in 2001, by denying his promotion to Lieutenant in 2002.  Plaintiff concedes that (a) he was eighth on the Merit System

Board Promotional List at the time in question,[20] (b) five officers – all of whom were ahead of him on the list – were promoted, and (c) that he was not skipped over on the list. See Pl. Statement of Material Facts, ¶ 31; Tr. (Oct. 12, 2006) at 84-85.  Rather, Plaintiff testified that "there were openings available for lieutenant and they did not want to promote me, so they promoted no one and allowed the list to expire with the openings there." Tr. (Oct. 12, 2006) at 85:10-13.

In support of its motion for summary judgment, Defendant refers the Court to minutes from several board meetings of the East Orange Board of Police Commissioners, wherein the Board of Police Commissioners entered resolutions to promote five officers to lieutenant. See Ferentz Cert., Ex. H-K.  The Court has reviewed the documents submitted by Defendant in this regard, and notes that the five officers who were promoted were ranked numbers 1, 2, 3, 6 and 7 on the "Certifications of Eligibles for Appointment" list.  See id. at Ex. H.  Plaintiff ranked number 8 on this list.[21]  Such meetings occurred from June through July 2002.

Plaintiff admittedly attempts to hold the City of East Orange responsible for certain deliberate choices made by Mayor Bowser and/or Chief Cleary, in their capacity as policymakers for the City of East Orange. See Pl.'s Response to Def. Statement of Material Facts, ¶ 3; Pl. Opp'n Br. at 12, 15.   Plaintiff must, therefore, present evidence that a "deliberate choice" made

---

[20] See Ferentz Cert., Ex. H.

[21] It should be noted that Plaintiff does not take issue with the manner in which officers were ranked, or the fact that he was ranked number 8 on the list.  Plaintiff takes issue only with the fact that Defendant could have – according to Plaintiff – promoted additional officers to lieutenant, but chose not to do so because they did not want to promote him. Tr. (Oct. 12, 2006) at 85:10-13.

by Mayor Bowser or Chief Cleary ultimately led to the decision to approve only five promotions to lieutenant that year. See generally, Pembaur, 475 U.S. at 483. The Court grants Defendant's motion for summary judgment on this issue because, as explained more fully below, Plaintiff has failed to allege – much less provide any credible evidence in support thereof – that Mayor Bowser or Chief Cleary directed or were in any way involved in the decision to promote only five officers to lieutenant that year.

As a preliminary matter, the Court notes that the Chief of Police at that point was not Cleary, but rather Chief Grimes.[22]  Accordingly, the Court will focus its responsibility analysis on the actions of Mayor Bowser as they relate to the decision made by the Board of Police Commissioner's to promote five officers to lieutenant in 2002.  The decision to promote five officers to lieutenant was adopted by the Board on July 29, 2002.  Although Mayor Bowser was present at the Board meetings leading up to July 29, 2002, there is no evidence before this Court suggesting that Mayor Bowser had any input in this decision until July 30, 2002, the date on which the matter was formally presented to – and ultimately approved by – him.  See Ex. K, Ferentz Cert.   Plaintiff provides no evidence showing that Mayor Bowser was in any way involved in the board's decision to promote five officers to lieutenant that year, let alone that he strategically directed same. See, e.g., Brennan, 350 F.3d at 423 (finding that plaintiff failed to demonstrate a First Amendment retaliation claim where he provided "no credible evidence" that

_____

[22] Although it is not entirely clear to the Court, based on the record and the parties' submissions, it appears that Chief Grimes was, in fact, reinstated at some point after the 2001 rally.

defendant was responsible for the alleged retaliatory acts).[23]

Absent such evidence, Plaintiff has not shown that a genuine issue of material fact exists as to whether his testimony at the Wright litigation, or his public support of Chief Grimes were substantial motivating factors in the Board's decision to promote <u>five</u> officers to lieutenant in 2002.  Summary judgment on this issue is, therefore, granted.

Requirement of Daily Activity Log

Plaintiff also alleges that the City of East Orange retaliated against him by requiring him to keep daily activity logs at a time during which no other sergeants were required to keep such logs.  <u>See</u> Tr. (Oct. 11, 2006) at 45:15-24.  In particular, Plaintiff claims that "I was being required to document hourly everything that I did in my unit while managing 33 programs and supervising multiple officers and volunteers, and nobody else at my rank or higher was being asked to do hourly reports in the police department, and this went over an extended period of time.  For several months I was required to do this every day." <u>Id.</u> at 53:13-20.

As a preliminary matter, Plaintiff provides no support for his assertion that other sergeants were not required to keep daily activity logs.  <u>See, e.g.</u>, <u>Brennan</u>, 350 F.3d at 421, 423 (holding that plaintiff failed to support First Amendment retaliation claim where he failed to give details of incidents of disparate treatment).  Even assuming that Plaintiff is correct in that no other sergeants were required to keep such daily activity logs, Plaintiff has provided no credible

---

[23] In light of the foregoing, the circumstantial evidence offered by Plaintiff – namely his testimony regarding a conversation he had with Mayor Bowser in 2001 wherein he was told that there would be consequences if he chose to publicly support Chief Grimes, and a conversation had between Edward Scott and Mayor Bowser at an unspecified time wherein Plaintiff was described as "not a team player"  – is insufficient to raise a genuine issue of material fact on this issue.

evidence that Mayor Bowser or Chief Cleary were responsible for imposing such a requirement. In fact, Plaintiff testified that "Lieutenant Hickson as well as Captain Sierchio, I believe, had me writing" such daily activity reports.  See Tr. (Oct. 12, 2006) at 45:17-19.  Aside from Plaintiff's generalized testimony that such orders were "coming down through the chief's office," id. at 54:22-23, Plaintiff has provided no credible evidence specifically linking Mayor Bowser or Chief Cleary with the requirement that he submit daily log activities.  As a result, no reasonable fact finder could conclude that this requirement was the result of unconstitutional retaliation directed by Mayor Bowser or Chief Cleary.  Defendant is, therefore, entitled to summary judgment on this particular allegation of retaliation.

<u>Order to Return Vehicles</u>

Plaintiff claims that he was retaliated against by being forced to turn over certain vehicles to the Police Department which were owned and paid for by the Police Athletic League, or face the risk of being disciplined.  (Compl., ¶ 21).  Defendant moves for summary judgment on this issue on the basis that this Court specifically ordered the return of said vehicles; therefore, this was not an act of retaliation.   (Def. Br. at 12).  Plaintiff does not dispute that said vehicles were in fact owned by the Police Athletic League, or that this Court ordered the return of same.[24]

As a preliminary matter, Plaintiff has not shown how requiring an officer to return a vehicle owned by the Police Athletic League to the Police Department establishes improper retaliatory conduct under § 1983.  Although such conduct could be retaliatory if Mayor Bowser or Chief Cleary made such request of some officers and not others, Plaintiff has provided no

---

[24] See CM/ECF Docket Entry Nos. 9, 10.

evidence of such disparate treatment here.  See, e.g., Brennan, 350 F.3d at 421.  As a result, the Court concludes that this alleged act of retaliation is not substantive.  Summary judgment on this issue is, therefore, granted.

Even assuming, arguendo, that such conduct rose to the level of a substantive constitutional violation, the Court notes that the Complaint does not specify the time frame in which such a request for the return of the vehicles was initially made on Plaintiff, or the individual who was responsible for making such a request.  Plaintiff's Statement of Uncontested Facts is equally unhelpful.  In fact, although Plaintiff explains in his opposition brief that "[t]he retaliatory acts are fully set forth in Plaintiff's Statement of Uncontested Facts and for the sake of brevity will not be repeated here," Plaintiff's Statement of Uncontested Facts contains no mention whatsoever of this particular act of retaliation.  It is not the Court's responsibility to sift through Plaintiff's submissions in an attempt to find evidence which supports or provides better context for each of Plaintiff's allegations. See, e.g., Albrechtsen v. Board of Regents of University of Wisconsin Sys., 309 F.3d 433, 436 (7th Cir. 2002) (" 'Judges are not like pigs, hunting for truffles buried in' the record.").  Rather, in responding to a properly pled motion for summary judgment, the burden lies on Plaintiff to identify such pieces of evidence, and to bring such evidence to the Court's attention.  Plaintiff has not identified a single piece of evidence which supports or otherwise bolsters this particular alleged act of retaliation. Plaintiff has not even directed the Court to the relevant portions of Plaintiff's deposition testimony – the transcript of which spans over 100 pages.  Without the proper chronology of events and/or context in which such a request for the return of the vehicles was made, no reasonable fact finder could tie Plaintiff's First Amendment activities to this alleged act of retaliation. See, e.g., Brennan, 350

F.3d at 422 ("Brennan has not established the date of the alleged revocation.  Absent a proper

chronology or similar circumstances to allow a reasonable fact finder to tie the revocation to

Brennan's First Amendment activities, the nexus necessary to establish a retaliatory motive is

simply lacking.").  Defendant's motion for summary judgment on this issue is, therefore, granted.

<u>Sick Leave</u>

Plaintiff claims that his request for (and use of) sick leave was handled differently than it

was for other police officers, in retaliation for his testimony on behalf of Captain Wright in 1997

and/or his public support of Chief Grimes in 2001. (Pl. Statement of Uncontested Facts, ¶ 26). In

particular, Plaintiff alleges that "[t]he rules and regulations required that the medical officer

know my whereabouts [while on sick leave], which is what I complied with regularly. . .

However, for some reason that wasn't sufficient [in my case] so internal affairs felt it necessary

to – specifically Lieutenant Cook – constantly try to find out where I was and what I was doing as

opposed to other officers who were out on sick" leave.  <u>See</u> Tr. (Oct. 11, 2006) at 65:4–68:15.

Once again, Plaintiff does not identify for the Court the general time frame in which such

alleged retaliatory conduct occurred,[25] nor does Plaintiff assign responsibility for such alleged

retaliatory conduct.  By the same token, Plaintiff has not shown how something so basic as

keeping your employer apprised of your whereabouts while out on sick leave establishes

improper retaliatory conduct under § 1983.  "We realize, of course, that this kind of conduct

---

[25] In the context of addressing a separate alleged act of retaliation, Plaintiff testified, in
passing, that it occurred the same "year I went out sick" – 2005. <u>See</u> Tr. (Oct. 11, 2006) at 70:23-
71:6.  The fact that a specific date may be buried amidst Plaintiff's various attachments –  which
includes a 100-page deposition transcript – does not excuse Plaintiff's responsibility to bring
such critical details to the Court's attention in his Statement of Facts or his opposition brief.

could be retaliatory if a supervisor makes such routine requests of some employees and not others, but there is no evidence of such disparate treatment in response to protected expression here." <u>Brennan</u>, 350 F.3d at 421.   Although Plaintiff testified that other officers who were out on sick leave were treated differently, he has not given the details of those incidents. "Thus, we do not know if those other instances were similar to [Plaintiff's] or not." <u>Brennan</u>, 350 F.3d at 423. As a result, the record does not contain sufficient information to allow a trier of fact to attach liability for this alleged act of retaliation, even assuming that it would otherwise be actionable. Summary judgment as to this claim is, therefore, granted.

<u>Reassignment from Community Service to Patrol</u>

Plaintiff's Statement of Uncontested Facts contains the assertion that "[w]hen Davis was reassigned in April, 2005, from Community Service to patrol, the City also deviated from policy. Davis was given less than twenty-four hours to pack-up and move out of his office.  The standard practice was an order is posted on Wednesday and made effective on Sunday." (Pl. Statement of Uncontested Facts, ¶ 30).  Plaintiff also testified that his reassignment was announced at a press conference held by the City of East Orange, and that such an announcement was unprecedented. <u>See</u> Tr. (Oct. 11, 2006) at 69:1-12.  As a preliminary matter, Plaintiff does not allege his reassignment from community service to patrol as an act of retaliation in his Complaint.  In any event, to the extent that the Court should construe such an allegation as an act of retaliation, based on the reasons that follow, Plaintiff has not shown that a genuine issue of material fact exists as to whether such transfer constituted an act of retaliation.

First, although Plaintiff argues that the City of East Orange deviated from their standard practice in effectuating his transfer, Plaintiff has failed to provide <u>any</u> evidence, whatsoever,

Page 27 of  32

showing what the standard practice was for transfers within the East Orange Police Department. In the same vein, Plaintiff provides no evidence that other internal transfers were handled differently.   For instance, Plaintiff provides no proof that a press conference was, in fact, held to announce his reassignment, or that similar departmental transfers were made in the past without a corresponding press conference. See, e.g., Brennan, 350 F.3d at 421, 423 (holding that plaintiff failed to support First Amendment retaliation claim where he failed to give details of incidents of disparate treatment).

Secondly, even if Plaintiff is correct in stating that his supervisors deviated from the standard practice in effectuating his transfer from community service to patrol, Plaintiff has provided no evidence showing that the City of East Orange – through the actions of Mayor Bowser or Chief Cleary – was responsible for this transfer or the press conference related thereto. See, e.g., Brennan, 350 F.3d at 423 (finding that plaintiff failed to demonstrate a First Amendment retaliation claim where he provided "no credible evidence" that defendant was responsible for the alleged retaliatory acts).   Other than Plaintiff's testimony regarding a conversation he had with Mayor Bowser four years prior to the transfer (in 2001),[26] and a conversation had between Edward Scott and Mayor Bowser at an unspecified time wherein Plaintiff was described as "not a team player,"[27] Plaintiff has provided no evidence of a causal connection between the actions of Mayor Bowser or Chief Cleary and this transfer, or proof that the circumstances underlying his transfer from community service to patrol were otherwise motivated by retaliatory animus. See, e.g., Brennan, 350 F.3d at 425 (finding insufficient

---

[26] See Tr. (Oct. 11, 2006) at 73:12-22.

[27] See Tr. (Oct. 11, 2006) at 86:10-17.

evidence to conclude that defendant's actions were retaliatory where the "nexus arises only from

Brennan's allegations, rather than proof that he submitted."). Moreover, the 4 to 8 year time

lapse between Plaintiff's protected activities and this transfer is too remote to support an

inference of retaliation. See id. at 424. Summary judgment as to this alleged act of retaliation is,

therefore, granted.

      Accordingly, Plaintiff has not established that his protected activities were a substantial or

motivating factor in any of the alleged retaliatory acts.[28]  Defendant's motion for summary

judgment as to Plaintiff's First Amendment retaliation claim is, therefore, granted in its entirety.

## III.  State Law Claim

      Count Two of Plaintiff's Complaint asserts a related state law claim seeking payment of a

tuition bill for certain law enforcement personnel courses taken by Plaintiff at Fairleigh

Dickinson University. (Compl., ¶ 6). In this regard, Plaintiff testified that "[a]ll of my staff was

sent to school for training. Everyone's bill was paid except mine, and to date my bill is still not

paid." Tr. (Oct. 11, 2006) at 56:1-3. Defendant moves for summary judgment on the basis that

(a) the Fairleigh Dickinson bill was paid in full as soon as Plaintiff submitted proof of the

amount owed, and (b) Plaintiff has submitted no documentation to substantiate his claim for

damages. (Def. Br. at 12). Plaintiff does not dispute that the Fairleigh Dickinson bill has since

been paid by Defendant. Instead, Plaintiff maintains that he is entitled to relief because his credit

---

[28] Therefore, the Court need not assess whether Defendant has established that the same
adverse employment actions would have taken place even in the absence of the protected
conduct. See, e.g., Hill, 411 F.3d at 125; San Filippo, 30 F.3d at 430-31.

has been damaged by Defendant's delay in paying same.[29]  In this regard, Plaintiff testified that "I have had this outstanding on my credit rating for over three years, and it caused me to have to pay higher interest rates on my mortgages as well as me being refused credit because of it." Tr. (Oct. 11, 2006) at 57:9-14.

As a preliminary matter, it is not entirely clear to the Court the specific legal basis on which this claim is brought.  In any event, the Court agrees with Defendant that to the extent Plaintiff claims to have been damaged by Defendant's failure – or delay – in paying the tuition bill, Plaintiff has failed to substantiate any such claim for damages.  For instance, although Plaintiff asks the Court to issue an Order compelling Defendant to "write to all credit rating agencies that it was Defendant's fault alone that F.D.U. was not paid in a timely manner," (Compl., Second Count, ¶ 9), Plaintiff has not provided the Court with a single credit report or piece of documentary proof to substantiate his claim that his credit rating was damaged specifically by his failure to pay this Fairleigh Dickinson bill in a timely fashion.  For instance, Plaintiff could have attached a copy of his credit report from the time period prior to the date on

_____

[29] The Court notes that Defendant's failure to pay Plaintiff's Fairleigh Dickinson tuition bill is not listed as an alleged act of retaliation in Plaintiff's Complaint, nor does Plaintiff clearly articulate that this claim for relief – listed as an entirely separate cause of action in Plaintiff's Complaint – also forms the basis of Plaintiff's First Amendment retaliation claim, either in Plaintiff's Statement of Uncontested Facts, or in Plaintiff's brief in opposition to Defendant's motion for summary judgment. Even if the Court were to construe Plaintiff's claim in this regard as an alleged act of retaliation, Plaintiff has failed to provide any evidence that Mayor Bowser and/or Chief Cleary were responsible for paying such tuition bills, or even had the authority to do same. As a result, the record does not contain sufficient information to allow a trier of fact to attach liability for this alleged act of retaliation. See, e.g., Brennan, 350 F.3d at 424 ("Brennan's failure to identify the defendant or defendants responsible for these alleged incidents dooms these claims of retaliation, even assuming that they would otherwise be actionable.").

which the Fairleigh Dickinson bill became due and owing.  Plaintiff also could have provided the Court with a current copy of his credit report, presumably showing the alleged damage to his credit rating resulting from his failure to pay the Fairleigh Dickinson bill in a timely fashion. Plaintiff has provided the Court with neither.

Without any such evidence, the Court has no way of knowing how the unpaid Fairleigh Dickinson bill truly impacted Plaintiff's credit rating. Certainly, based on the record, the Court has no way of assessing liability for such speculative damages as against the City of East Orange. This matter has now been pending before this Court for over three years.  Discovery is now complete.  Plaintiff's conclusory statements and arguments will not suffice to preclude summary judgment on this claim.  See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)  (stating that the nonmoving party must "present affirmative evidence in order to defeat a properly supported motion for summary judgment.") (citation omitted); Celotex Corp., 477 U.S. at 322 (stating that if the opponent to a properly pled motion for summary judgment fails to make a sufficient showing regarding an essential element of his or her case upon which he or she will bear the burden of proof at trial, all other facts are necessarily immaterial and summary judgment must be granted.).  Accordingly, Defendant's motion for summary judgment as to this claim is granted.

## CONCLUSION

Based on the reasons set forth above, Defendant's motion for summary judgment is granted.[30] An appropriate Order accompanies this Opinion.


                                          /s/ Jose L. Linares
DATE:  September 15, 2008    _____United States District Judge

---

[30] To the extent that Defendant seeks an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), the Court declines, in its discretion, to award such fees to the prevailing party in this case.  The Court likewise declines to impose sanctions on Plaintiff's counsel, despite his failure to adhere to this Court's January 31, 2008 Order. Notwithstanding the Court's displeasure, the Court accepts the representations made by Mr. Klausner in his February 25, 2008 Certification.  Plaintiff's counsel is cautioned, however, to utilize his best efforts to ensure that all future filings before this Court are done in a timely fashion.